UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| LA'SHANE DONYALE SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>DR. MARY CARPENTER, INDIVIDUAL AND OFFICIAL CAPACITY; DR. REGIER, INDIVIDUAL AND OFFICIAL CAPACITY; PA MANSON, INDIVIDUAL AND OFFICIAL CAPACITY; NURSE LEANN, INDIVIDUAL AND OFFICIAL CAPACITY; NURSE KELLEY, INDIVIDUAL AND OFFICIAL CAPACITY; NURSING SUPERVISOR JESSICA, INDIVIDUAL AND OFFICIAL CAPACITY; and NURSE RACHAEL TYCZ, INDIVIDUAL AND OFFICIAL CAPACITY,<br><br>Defendants. | 4:20-CV-04135-RAL<br><br><br>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I.      Procedural history

La'Shane Donyale Scott has been incarcerated in the South Dakota prison system since 2011 and is currently housed in the South Dakota State Petitionary (SDSP) in Sioux Falls.  Doc. 1; Doc. 39 at 1; Doc. 43.  Scott filed a 42 U.S.C. 1983 complaint on September 17, 2020, alleging violations of his Eighth Amendment right against cruel and unusual punishment.  Doc. 1; Doc. 39 at 2.  He named seven medical professionals as defendants: Dr. Mary Carpenter, Medical Director for the Correctional Health Care in South Dakota; Dr. Eugene Regier, a doctor at SDSP; Ryan Manson, a physician's assistant at SDSP; LeAnn Peterson, a nurse at SDSP;

1

Kelley Swanson, a nurse at the Mike Durfee State Penitentiary (MDSP); Jessica Schreurs, a supervising nurse at MDSP; and Rachael Tycz, a nurse at MDSP. Doc. 1; Doc. 27 at 2–3; Doc. 65 at 1. Nurse Swanson could not be served. Doc. 39 at 2. Scott alleges that the Defendants displayed deliberate indifference to his medical needs over a span of seven years and sues them in their individual and official capacities. Doc. 1.

Scott subsequently filed an amended complaint and a second amendment complaint. Doc. 7; Doc. 9. In his second amendment complaint, Scott raised supplemental state tort claims of medical malpractice and negligence. Doc. 9. Scott claims that he has scar tissue in his penis and has difficulty sustaining an erection due to the Defendants' deliberate indifference to his serious medical issues. Doc. 9. He seeks $100,000 in damages for pain and suffering, payment for all future and current medical bills, and a preliminary injunction ordering the surgical repair of his urethra. Doc. 1; Doc. 9.

This Court determined Scott's complaints stated a claim under the Eighth Amendment but dismissed his supplemental tort claims. Doc. 10 at 3–4. On February 8, 2021, the Defendants filed a motion for summary judgment. Doc. 35. On May 17, 2021, after this Court granted Scott a five-week extension to respond, Scott filed a memorandum opposing the Defendants' motion.

## II.     Facts

Other than where noted, the following facts are not in dispute. However, Scott wants to conduct additional discovery. Doc. 55.

### A. 2013 to 2016

Beginning in 2013, Scott began to have trouble urinating due to what was later diagnosed as a urethral stricture—a blockage or narrowing of the urethra that can make urination painful

2

and difficult. *Urethral Stricture Disease*, UROLOGY CARE FOUNDATION

https://www.urologyhealth.org/urology-a-z/u/urethral-stricture-disease (last visited Aug. 26,

2021). At that time, Scott claims he suffered from a stutter stream, weak urine flow, and urinary

tract infections (UTIs). Doc. 1. Health Services at SDSP gave Scott antibiotics for his UTIs.

Doc. 1. However, one Saturday night in 2013, Scott alleges he began to urinate blood clots and

suffered severe pain when voiding. Doc. 1; Doc. 9. He went to Health Services that night for

treatment, where he claims that Nurse Peterson observed his "failure to stop bleeding" but denied

his request to be sent to the hospital. Doc. 1; Doc. 9; Doc. 39 at 3. Further, Scott alleges that

Nurse Peterson told him he could not receive further care until Monday morning, gave him an

ice pack, and sent him back to his housing unit. Doc. 1; Doc. 9. "Shortly thereafter," Scott

claims he developed scar tissue in his urethra that made it almost impossible to urinate, and when

he urinated, Scott claims it felt like "urinating razor blades." Doc. 1.

The record does not document when Scott began to use a catheter to void, but in April

2014, Scott alleges that nursing staff unsuccessfully attempted to catheterize him three times.

Doc. 1. He was transported to a hospital in Sioux Falls, where the Emergency Room (ER)

physician unsuccessfully attempted to insert an "indwelling" Foley catheter through Scott's

urethra.[1] Doc. 1; Doc. 37 at 2; Doc. 39 at 4. Subsequently, Urologist Dr. Arend performed a

cystoscopy,[2] a diagnostic procedure that allows a physician to examine a patient's bladder, and

---

[1] Foley Catheters are a common, indwelling catheter. *Urinary catheters*, MEDLINE PLUS,
https://medlineplus.gov/ency/article/003981.htm (last visited Aug. 26, 2021). They are typically
inserted into the bladder through the urethra and collect urine in a catheter bag secured to the leg.
Id.
[2] During a cystoscopy, a physician inserts a cystoscope, a thin tube with reflective lenses,
through the urethra and into the bladder. *Cystoscopy*, UROLOGY CARE FOUNDATION,
https://www.urologyhealth.org/urology-a-z/c/cystoscopy (last visited Aug. 26, 2021). The
cystoscope transports water or saline into the bladder to stretch it so that a physician can examine
the bladder for abnormalities. Id.

determined Scott's urethra was completely obstructed. Doc. 37 at 2; Doc. 39 at 4. The obstruction or "urethral stricture" had prevented insertion of the catheter. Doc. 37 at 2–3; Doc. 39 at 4. Due to the obstruction, Dr. Arend fitted Scott with a suprapubic catheter, which is inserted directly into the bladder through a small hole in the patient's stomach and collects urine in a bag outside of the body. Doc. 1; Doc. 39 at 4; *Suprapubic catheter care*, MEDLINE PLUS, https://medlineplus.gov/ency/patientinstructions/000145.htm (last visited Aug. 26, 2021).

In June 2014, Dr. Arend performed another cystoscopy on Scott and unsuccessfully attempted to make an incision to the urethral stricture. Doc. 39 at 4. In September 2014, Dr. Witte, another urologist, examined Scott and performed antegrade and retrograde cystoscopies, antegrade and retrograde urethrographies, and a suprapubic catheter tube exchange. Doc. 37 at 2-3; Doc. 39 at 4. He determined Scott had a "complete obliteration of the bulbar urethra for approximately 1 cm from the membranous urethra." Doc. 37 at 3. Due to the complexity of the stricture, Dr. Witte recommended referring Scott to a reconstructive urologist located out of the State. Doc. 37 at 3. However, he ultimately concluded Scott was not eligible to be referred due to his incarceration. Doc. 37 at 3.

On September 30, 2016, Scott was transferred from SDSP to MDSP in Springfield, South Dakota. Doc. 38. Scott continued to use a suprapubic catheter from 2014 to 2017, and his catheters were changed monthly. Doc. 39 at 8.

**B. 2017**

On November 1, 2017, Scott visited Health Services at MDSP for his monthly catheter change. Doc. 37 at 4. On November 13, 2017, at around 11:15 p.m., Scott visited Health Services complaining of bladder spasms and difficulty voiding. Doc. 37 at 4; Doc. 39 at 5. The medical records show Nurse Janelle Wilking was working that night, although Scott claims that

Nurses Tycz and Swanson attended him. Doc. 36 at 19; Doc. 55 at 3. The medical records show that Scott produced some urine, although he complained that it was difficult to void. Doc. 37 at 4. Nursing staff noted that Scott winced occasionally but did not appear to be in great distress. Doc. 37 at 4; Doc. 39 at 6. He was able to maintain a normal conversation without showing signs of pain. Doc. 37 at 4; Doc. 39 at 6. Scott claims that he could not void that night. Doc. 55 at 4. He also claims that he attempted to hide his pain because showing weakness or frailty makes one vulnerable to assault or harassment in prison. Doc. 55 at 12.

Nursing staff performed a urine dipstick test, in which a thin plastic strip is placed in urine to detect UTIs or other abnormalities. *Urinalysis*, MAYO CLINIC, https://www.mayoclinic. org/tests-procedures/urinalysis/about/pac-20384907 (last visited Aug. 26, 2021). The test showed abnormalities in Scott's urine, which nursing staff documented and escalated for review before sending Scott back to his housing unit. Doc. 37 at 4; Doc. 39 at 6. Before his dismissal, Scott claims that he "was told 'all that [he] wanted was a free ride to the hospital.'" Doc. 55 at 26.

At around 1:18 a.m. on November 14, 2017, Lieutenant Spulak escorted Scott back to Health Services. Doc. 37 at 4; Doc. 55 at 5. Scott submitted an affidavit from another inmate, Curtis Weddell, who stated Lieutenant Spulak walked Scott back to Health Services after he observed Scott's catheter drainage bag was empty. Doc. 44.

Scott repeated his complaints of bladder spasms and severe pain to nursing staff. Doc. 39 at 6. Nursing staff noted that Scott appeared to be in pain because he was hunched over and refused to sit down. Doc. 37 at 4; Doc. 39 at 6. The medical records show nursing staff flushed Scott's catheter with 60 ccs of sterile water. Doc. 39 at 6. Scott disputes that his catheter was flushed, and he states nursing staff's attempts to irrigate his catheter caused him great pain. Doc.

55 at 6.  The medical records document that Scott became agitated when he overheard nursing staff say that his catheter was "flushed without problems."  Doc. 39 at 6.

Scott demanded a catheter change, which he alleges nursing staff refused to do.  Doc. 39 at 7; Doc. 55 at 6.  Scott became more agitated and punched the exam table.  Doc. 39 at 7. Nursing staff asked Scott several times to lower his voice and eventually left the room when he did not comply.  Doc. 39 at 7.  Nursing staff told Scott that they would not reenter until he calmed down.  Doc. 39 at 7.  The medical reports document that Scott was sweating from his forehead and began to fiddle with this catheter and push it further into his body.  Doc. 39 at 7. Scott disputes that he attempted to touch or "advance" his catheter.  Doc. 55 at 7.  He also claims the nursing staff attempted to get him to say something "inappropriate" at this time, putting him at risk of transfer to MDSP's Segregated Housing Unit.  Doc. 1.

Nursing staff told Scott to stop pushing on the catheter because he could get an infection. Doc. 39 at 7.  Scott remained agitated, asked to be taken to the hospital, and demanded to speak to a lawyer or his family.  Doc. 39 at 7.  At that time, nursing staff decided to transfer Scott to the hospital for an evaluation.  Doc. 39 at 7.

The ER physician noted that Scott was brought in because his suprapubic catheter would not drain.  Doc. 39 at 8.  The physician was unable to irrigate Scott's catheter and replaced it with a "16 French" catheter.  Doc. 37 at 6; Doc. 39 at 8.  Once the new catheter was inserted, Scott's urine flow was normal, and he was more comfortable.  Doc. 37 at 6; Doc. 39 at 8.  According to Scott, he had E. coli infection and could have developed sepsis if he was not taken to the hospital. Doc. 1; Doc. 54 at 36; Doc. 55 at 8–9.  The medical records do not mention an E. coli infection but instead document that Scott's white blood cell count and temperature were normal.  Doc. 37 at 6; Doc. 39 at 8–9.

6

On November 16 and 17, 2017, Scott went to Health Services to receive IVs for his prescribed antibiotics. Doc. 39 at 9–10. Around this time, nursing staff issued him a nighttime catheter bag; the third bag issued to him that month. Doc. 39 at 9. On November 28, 2017, Scott visited Health Services complaining of bladder spasms. Doc. 39 at 10. Nursing staff noted that Scott did not appear to be distressed and was "laughing and joking with other inmates in the lobby." Doc. 39 at 11. They instructed him to return during a routinely scheduled sick call if he still had issues at that time. Doc. 39 at 11. Scott claims that he attempted to hide his pain that day because showing weakness is dangerous in prison. Doc. 55 at 12. The next day, nursing staff asked Scott to submit a sample for urinalysis, prescribed Scott an antibiotic, and scheduled a follow-up urology appointment for Scott's recurrent UTIs. Doc. 39 at 11–12. Scott alleges he only received the appointment because correctional staff intervened and demanded that Scott be seen by a urology specialist. Doc. 55 at 16–17.

Nursing staff performed a monthly catheter change on December 13, 2017. Doc. 39 at 12. Scott did not raise new medical concerns during this appointment. Doc. 39 at 12. Scott concedes that he did not report any pain to nursing staff but now claims that he suffered continual pain beginning in 2013 and during this catheter change. Doc. 55 at 15. Scott maintains that he hid his pain, in part, because he learned that it was best to appear "cheerful" and compliant before nursing staff to increase the likelihood of receiving care. Doc. 55 at 15. According to Scott, during visits to Health Services that month, nurses Swanson and Tycz also "verbally berated [him] in front of staff and inmates for requesting replacements" of ruptured catheter bags and were reluctant to provide the replacements. Doc. 55 at 15. Nonetheless, Scott does not dispute that he requested and was provided additional catheter bags and split sponges in

December 2017.  Doc. 37 at 9, 13; Doc. 39 at 11–12; Doc. 55 at 15.  Scott also requested and was provided a bed wedge to address his nighttime drainage issues.  Doc. 37 at 10.

## C. 2018

Scott visited Health Services on January 5, 2018, complaining of bladder spasms and a possible bladder infection.  Doc. 37 at 10.  Nursing staff collected a sample and ordered a urine culture.  Doc. 37 at 10.  Scott had a monthly catheter change on January 16, 2018.  Doc. 39 at 14.  He did not report pain or discomfort during this visit.  Doc. 39 at 14.  On January 18, 2018, urologist Dr. George Fournier saw Scott at his Yankton clinic.  Doc. 37 at 11.  Scott told Dr. Fournier his symptoms were intermittent and improving.  Doc. 39 at 14.  Dr. Fournier recommended a cystoscopy to better diagnose Scott's urethra, which was scheduled.  Doc. 37 at 11–12.

Scott visited Health Services on February 1, 2018, complaining of leaks in his leg bags and overnight drainage bag.  Doc. 37 at 12.  Nursing staff noted that Scott had duct-taped portions of his leg bag and educated him on proper bag maintenance, such as where to place his large drainage bag while he slept to minimize the risk of damaging it.  Doc. 37 at 12; Doc. 39 at 15–16.  Scott claimed nurses Swanson and Tycz gave him duct tape so that they would not have to give him more drainage bags.  Doc. 55 at 18.  He also alleges they "belittled and berated" him during the visit.  Doc. 55 at 18.  Scott submitted affidavits from several inmates who stated that Scott had complained previously that nursing staff did not take his requests for medical care seriously and talked down to him.  Doc. 44; Doc. 45.

Scott had a monthly catheter change on February 16, 2018, during which he reported pain when Nurse Tycz inserted a new catheter.  Doc. 37 at 12; Doc. 39 at 16.  Per Scott's request, Nurse Tycz inserted 8 mL of fluid into the catheter balloon to mitigate his discomfort.  Doc. 37

8

at 12–13; Doc. 39 at 16.  On February 27, 2018, Dr. Fournier performed a cystoscopy on Scott.

Doc. 37 at 13; Doc. 39 at 16.  The cystoscopy revealed that Scott had a "complete blockage of

the bulbar urethra by a stricture that appears to have been traumatic in origin." Doc. 37 at 13;

Doc. 39 at 16.  Scott alleges that the nursing staff may have aggravated this blockage or stricture

by attempting to catheterize him over the years and requests the appointment of an expert during

discovery.  Doc. 55 at 18.

Dr. Fournier recommended that Scott undergo a "endoscopic incision of the stricture"

and "serial dilation" so that he could urinate normally.  Doc. 29 at 2; Doc. 37 at 13; Doc. 39 at

16.  Dr. Fournier also recommended that Scott use an "SP tube," which would allow him to

intermittently empty his bladder, rather than use a drainage bag to collect urine.  Doc. 39 at 17.

Based on Dr. Fournier's recommendation, Health Services scheduled an endoscopic incision and

surgical dilation appointment for April 9, 2018.  Doc. 39 at 17.  Nursing staff gave Scott a leg

bag to use until he learned to urinate in the toilet again.  Doc. 39 at 17.

On March 16, 2018, Scott appeared at Health Services for an appointment.  Doc. 39 at

17.  Nursing staff informed him he was not scheduled for an appointment and his health care

provider was not present that day.  Doc. 39 at 17–18.  Scott became upset and demanded to be

seen.  Doc. 39 at 18.  After he raised his voice and demanded to speak to supervising staff, a

correctional officer intervened, brought Scott back to his housing unit, and directed him to bring

his complaint to the "Officer In Charge."  Doc. 39 at 18.  After the incident, Scott submitted a

kite slip asserting that he was tired of dealing with "rude staff" at Health Services and no longer

wanted monthly catheter changes unless ordered by a urologist.  Doc. 39 at 18–19.

Nevertheless, Scott appeared for a catheter change on March 19, 2019.  Doc. 37 at 15;

Doc. 39 at 19.  At the appointment, Scott reported that he did not want to replace his catheter

because "nurses here are the mafia." Doc. 37 at 15; Doc. 39 at 19. After nursing staff informed him that routine catheter changes were crucial to prevent infection, Scott agreed to the catheter replacement. Doc. 39 at 19.

Nursing staff saw Scott again on March 30, 2018 for a physical exam before his surgery, during which Scott did not report any particular problems or concerns. Doc. 39 at 19; Doc. 55 at 20. On April 9, 2018, Scott's surgery was postponed for security reasons after he was observed taking a phone call on his tablet. Doc. 37 at 16; Doc. 39 at 20. Scott claimed that he was calling his mother for emotional support. Doc. 55 at 20. Around this time, Scott also claims Nurses Tycz and Swanson discussed his medical conditions publicly in the Health Services waiting room, which humiliated him and violated his HIPPA rights. Doc. 55 at 19.

On April 30, 2018, Dr. Fournier performed a retrograde flexible cystoscopy, simultaneous urethroscopy, and urethral dilations. Doc. 37 at 16; Doc. 39 at 20. He also made an incision of the stricture and fitted Scott with a Foley catheter, replacing Scott's suprapubic tube. Doc. 29 at 2; Doc. 37 at 16; Doc. 39 at 20. The surgery went without complications. Doc. 39 at 20. When Scott returned to MDSP, nursing staff educated him on basic catheter care, and Scott thanked them. Doc. 39 at 20–21.

On May 6, 2018, Scott reported to Health Services complaining of pain and drainage from his penis. Doc. 37 at 17; Doc. 39 at 21. Nursing staff observed that Scott's Foley catheter was in place and there was "scant" penile discharge. Doc. 39 at 21. Nursing staff collected the discharge for a culture and prepared the sample for Dr. Fournier's review. Doc. 39 at 21. On May 9, 2018, Scott requested pads for his discharge, and nursing staff provided him with a bag of underwear briefs. Doc. 37 at 19; Doc. 39 at 23. Scott had a follow up appointment with Dr.

Fournier on the same day.  Doc. 39 at 22.  Dr. Fournier diagnosed Scott with "proteus sensitive" based on the culture results and prescribed him antibiotics for seven days.  Doc. 39 at 22.

Scott saw Dr. Fournier again on May 17, 2018 for the first of weekly urethral dilation treatments.  Doc. 39 at 23.  Scott's urine stream was good at the appointment.  Doc. 39 at 23.  Scott returned for dilation treatment on May 24, 2018, during which he reported a good urine stream but concern of nocturia, or frequent nighttime urination.  Doc. 39 at 23–24.  Dr. Fournier instructed Scott to document the time and amount he urinated he each night.  Doc. 39 at 24.  During a follow up appointment with Health Services on May 29, 2018, Scott admitted that he had not recorded his nightly urine output and denied having further issues with nighttime urination.  Doc. 37 at 20; Doc. 39 at 24.  Scott claims that he kept track of his urination for a few days but struggled to document every time he urinated each night.  Doc. 55 at 21.  Scott had two more dilation appointments with Dr. Fournier on May 31, 2018 and June 7, 2018 respectively.[3] Doc. 39 at 25.

---

[3] Around this time, Scott submitted kite slips requesting care for skin issues.  On June 11, 2018, he requested a culture of bumps on his face and body.  Doc. 37 at 20; Doc. 39 at 25.  He also requested a dermatology consult.  Doc. 37 at 22.  Scott was diagnosed with "pseudofolliculitis barbae," commonly known as "razor bumps," and was prescribed medication.  Doc. 39 at 26; *Pseudofolliculitis Barbae*, AMERICAN OSTEOPATHIC COLLEGE OF DERMATOLOGY, https://www.aocd.org/page/pseudofolliculitisb (last visited Aug. 26, 2021).  Scott also complained of severe pain in his right knee, where he had moderate to severe arthritis.  Doc. 37 at 21; Doc. 39 at 25.  Scott was prescribed new medication to address his pain.  Doc. 37 at 21; Doc. 39 at 25.  In Scott's verified statement of disputed material fact, he states the medications prescribed for his skin condition were ineffective and his care was inadequate.  Doc. 55 at 22, 36.  He also alleges that he was deterred from discussing his skin issues and other medical concerns with nursing staff because of their "habit of discussing medical conditions in the waiting area."  Doc. 55 at 22.  Scott's claims concerning treatment for his skin and knee were not pleaded in his complaint and thus will not be addressed further here.  See *Wendt v. Iowa*, 971 F.3d 816, 821 (8th Cir. 2020) ("The pleading requirements under the Federal Rules of Civil Procedure, while relatively permissive, do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." (cleaned up and citations omitted)).

At a dilation appointment on June 14, 2018, Dr. Fournier noted Scott's bladder was on track to return to a normal state. Doc. 37 at 21; Doc. 39 at 26. Scott had a fifth dilation appointment on June 21, 2018, and a sixth appointment on June 28, 2018. Doc. 39 at 26–28.

Scott did not report other urination issues until July 21, 2018, when he stated it was hard to urinate and there was blood in his urine. Doc. 37 at 24; Doc. 39 at 28. Scott also claims that he had issues with urine flow in the weeks after his last dilation appointment on June 29, 2018, although he does not dispute that he did not report these issues to nursing staff. Doc. 55 at 23. Nursing staff conducted a dipstick test, instructed Scott to return the next Monday for a follow-up appointment, and notified Dr. Fournier. Doc. 39 at 29. At Scott's follow up appointment on July 23, 2019, he reported his urine stream had improved and there was no more blood in his urine. Doc. 39 at 29. During this visit, Scott also expressed concern that he still had scar tissue in his urethra that required surgery. Doc. 37 at 24; Doc. 39 at 29. Scott believes the growth of scar tissue could account for his difficulty voiding and wants to conduct discovery and appoint an expert on the subject. Doc. 55 at 23–24.

On August 1, 2018, Scott submitted a kite slip complaining that he could not urinate and requesting to see a urologist immediately. Doc. 37 at 25; Doc. 39 at 30. When he visited Health Services that day, Scott told nursing staff that he had urinated ten minutes before, but it was difficult to void and "something wasn't right." Doc. 37 at 25; Doc. 39 at 30. The medical notes documented that Scott denied having blood in his urine and reported he was feeling better since beginning new medication three days before. Doc. 39 at 30. Scott claims that he suffered pain when voiding at the time, and his medication only helped for a few days but did not "cure" him. Doc. 55 at 24.

12

After listening to Scott's symptoms, nursing staff called Dr. Fournier but received no response. Doc. 37 at 26; Doc. 39 at 31. Scott was sent to the ER for an evaluation. Doc. 37 at 26; Doc. 39 at 31. Scott informed ER staff that, with some strain, he was able to void. Doc. 37 at 26. ER staff noted it was "unclear what the urgency for transfer here was this evening as he [Scott] appears to be very comfortable." Doc. 37 at 26; Doc. 39 at 31. The ER physician discussed giving Scott a Foley catheter. Doc. 37 at 26; Doc. 39 at 31. Scott refused but agreed to be fitted with a straight catheter, which was inserted successfully. Doc. 37 at 26–27, 61; Doc. 39 at 31. Even though Dr. Fournier had fitted Scott with a Foley catheter in April 2018, Doc. 37 at 16; Doc. 39 at 20, Scott claims that he refused placement of a Foley catheter because he believed that it could damage his urethra. Doc. 54 at 48; Doc. 55 at 25.

On August 9, 2018, Scott was in an altercation with another inmate, and his classification status changed to high/medium.[4] Doc. 38; Doc. 39 at 33. Consequently, on or about August 14, 2018, he was transferred from MDST to SDST. Doc. 38; Doc. 39 at 33. Scott's urology appointment was rescheduled to September 26, 2018, due to his relocation. Doc. 39 at 33. Scott submitted a variety of kite slips concerning knee pain and skin issues between his transfer that August and his September urology appointment, but he only submitted one kite slip concerning his urethral stricture. Doc. 37 at 28–29; Doc. 39 at 33–34. Scott claims that "every time [he]

---

[4] Scott alleges that he was assaulted while he slept in his room, he did not know his assailant, and he fought back in self-defense. Doc. 55 at 26; Doc. 58 at 20. The Defendants submitted correctional reports that contradict Scott's account. Doc. 62 at 4-5; Doc. 63 at 4-5. Surveillance video captured Scott pushing another inmate away from the entryway of his room before the two men began to throw punches. Doc. 62 at 4-5; Doc. 63 at 4-5. Both men exited the room, then Scott followed the other inmate down the hall where they began to throw punches again. Doc. 62 at 4-5; Doc. 63 at 4-5. During the fight, Scott also threw a large hallway fan toward the other inmate. Doc. 62 at 5; Doc. 63 at 5.

spoke to medical staff (without an audience listening), he complained about [his] urethral stricture and asked about this urology appointment." Doc. 55 at 27.

On September 26, 2018, Dr. Witte performed an antegrade and retrograde cystoscopy, an antegrade and retrograde urethrography, and a suprapubic tube exchange. Doc. 39 at 36. Dr. Witte observed that Scott had "tight bulbar urethral stricture," which was 1.5 to 2 cm. long, and noted that Scott might benefit from a urethroplasty. Doc. 29 at 4; Doc. 37 at 30; Doc. 39 at 36. However, a urethroplasty was not possible under the conditions of Scott's incarceration because it would require transfer to a specialist in another state. Doc. 29 at 4; Doc. 39 at 36. Therefore, Dr. Witte recommend an alternative treatment plan consisting of self-dilations or serial dilations. Doc. 29 at 4; Doc. 37 at 30; Doc. 39 at 36. After discussing the risks and benefits of both treatments with Dr. Witte, Scott opted for self-dilations. Doc. 29 at 4; Doc. 37 at 30–31; Doc. 39 at 36.

Scott demonstrated proficiency with self-dilation, was instructed to catheterize himself daily, and was scheduled a six-month follow up appointment with Dr. Witte. Doc. 37 at 31; Doc. 39 at 36. On September 28, 2018, Scott submitted a kite slip requesting to speak to "a person who has authority" about his recent urology visit. Doc. 37 at 31; Doc. 39 at 37. The next day, nursing staff gave Scott French cause-tip catheters and tube of lubricating jelly for self-catherization. Doc. 37 at 31; Doc. 39 at 37.

On October 3, 2018, Scott expressed frustration to nursing staff that Dr. Fournier and Dr. Witte had recommended different courses of treatment. Doc. 37 at 31; Doc. 39 at 37; Doc. 55 at 27. Nursing staff encouraged Scott to listen to Dr. Witte because Dr. Witte would provide his care while Scott was at SDSP. Doc. 37 at 31; Doc. 39 at 37. On November 19, 2018, nursing

staff provided Scott with catheters and a tube of jelly for self-catheterization.  Doc. 37 at 32;
Doc. 39 at 37.[5]

**D. 2019**

Scott visited Health Services multiple times from January 2019 to March 2019 for
complaints concerning knee pain, an armpit infection, a big toe infection, and skin issues.  Doc.
37 at 32–34; Doc. 39 at 39–40.  Nursing staff ordered skin cultures, scheduled a dermatology
consult, and provided Scott ice packs for his various complaints.  Doc. 39 at 38–40.  The medical
records do not show Scott complained of urological issues during these visits.  Doc. 39 at 38–40.
Scott alleges he complained of urinary issues during these visits but was told "that's not why
you're here."  Doc. 55 at 34.

Scott had a six-month urology follow up appointment on March 27, 2019 with Dr. Hans
Wagenaar.  Doc. 37 at 34; Doc. 39 at 41; Doc. 43.  Scott asked Dr. Wagenaar about
reconstructive surgery for his urethra.  Doc. 39 at 41.  Dr. Wagenaar informed Scott that a large
reconstructive center would be best suited to perform the surgery due to the complexity of
Scott's scar tissue but that, presently, such a surgery was likely impossible due to Scott's
incarceration.  Doc. 39 at 41; Doc. 43.  Dr. Wagenaar also noted Scott's urethral stricture
remained open due to self-dilation treatment.  Doc. 37 at 35; Doc. 43.  He instructed Scott to
continue self-dilation, and Scott was scheduled for another six-month follow up appointment.
Doc. 37 at 35, 37; Doc. 39 at 42, 44; Doc. 43.

---

[5] Scott also intermittently complained of knee pain from 2017 to 2020 and received treatment from
Health Services.  Doc. 39 at 11.  He had a total knee replacement on or before December 19, 2018.
Doc. 37 at 32.  On December 19, 2019, Scott visited Health Services complaining of warmth and
swelling in his right knee.  Doc. 37 at 32; Doc. 39 at 38.  On December 27, 2018, Scott requested
daily medical showers because, due to his knee surgery, he wished to avoid the stairs leading to
the prison showers.  Doc. 37 at 33; Doc. 39 at 38; Doc. 55 at 33.

Scott submitted kite slips on April 12, 2019, and the next several days that requested his medical records. Doc. 39 at 42. Health Services provided Scott the records on April 15, 2019. Doc. 39 at 42. Scott claims he was given incomplete records and requests discovery to determine what medical reports were not provided to him. Doc. 55 at 35.[6]

On July 10, 2019, Scott asked nursing staff why he had an upcoming urology appointment in September 2019. Doc. 37 at 38. Nursing staff explained that the appointment was recommended for his care. Doc. 37 at 38. At a visit to Health Services on August 1, 2019, Scott reported that he did not want to be held in SDSP once he became eligible for transfer to MDSP. Doc. 37 at 38; Doc. 39 at 45. Scott also refused his upcoming urology appointment "to avoid either staying at SDSP or being returned from MDSP for the appointment." Doc. 55 at 41. Scott was adamant that he would like to be seen by Dr. Fournier in Yankton for his urological care, rather than any urologist in Sioux Falls. Doc. 37 at 39; Doc. 39 at 45–46.

Per Scott's request, Health Services cancelled his urology appointment in Sioux Falls. Doc. 37 at 39; Doc. 39 at 46. Scott signed a release of responsibility stating he "want[ed] to be transferred to [M]DSP and address any further concerns with [the] Yankton provider who performed the surgery." Doc. 37 at 39; Doc. 39 at 46; Doc. 55 at 38. Scott agrees he "was anxious to return to [MDSP] as soon as possible" because of preferable housing conditions there. Doc. 55 at 37. He stated that he did not want to continue treatment with Dr. Witte in Sioux Falls because it would require him to spend a week in a cell with a stranger and Dr. Witte "had already

---

[6] In May 2019, Scott visited Health Services several times for complaints concerning skin breakouts, open sores, and difficulty climbing his bunk bed due to knee issues. Doc. 37 at 37; Doc. 39 at 42-43. Nursing staff did not observe open sores or skin discoloration on the locations about which Scott complained. Doc. 39 at 43. Nevertheless, they documented his complaints and escalated them for further review. Doc. 39 at 43.

determined that he was incapable of resolving [his] issues." Doc. 55 at 38.  Scott was transferred

to MDSP on or about August 23, 2019, and an appointment with Dr. Fournier was scheduled for

September 25, 2019.  Doc. 37 at 39; Doc. 38; Doc. 39 at 46.

At the September appointment, Dr. Fournier noted Scott had a "history of complete

occlusion of the urethra from catheter trauma." Doc. 37 at 40.  However, in April 2018, Scott

underwent "a cut for the light procedure that opened the stricture up and got him urinating

again." Doc. 37 at 40.  Dr. Fournier's medical notes do not suggest that using a catheter would

damage Scott's urethra.  Doc. 37 at 60; Doc. 39 at 72–74.  To the contrary, Dr. Fournier noted

Scott voided well, was "self-cathing to keep the stricture open," and self-catheterization had

prevented "restenosis [or narrowing] of the urethra." Doc. 37 at 40; Doc. 39 at 48, 74.  He

recommended another diagnostic cystoscopy to evaluate Scott's urethral "stricture patency,"

which was scheduled for November 20, 2019.  Doc. 37 at 40–41; Doc. 39 at 48.  Scott did not

raise any urological concerns during his visit to Health Services on October 10, 2019.  Doc. 39 at

48.

On October 19, 2019, Scott was involved in another altercation with an inmate.[7]  Doc. 39

at 48; Doc. 62 at 3.  His jaw was wired shut due to the injuries he sustained, and he was

instructed to follow a liquid diet.  Doc. 39 at 49; Doc. 53.  On October 25, 2019, nursing staff

received a report that Scott might be seizing in his barracks, and Scott was transported to the

hospital for evaluation.  Doc. 65 at 15.  Scott claims he was forced to subsist on applesauce once

his jaw was wired shut, which caused his seizure.  Doc. 54 at 14–15, 53.  The ER physician

suspected Scott's symptoms could be attributed to low blood sugar and gave Scott an Ensure

---

[7] The Defendants submitted correctional reports showing that Scott may have instigated the altercation.  Doc. 62 at 3; Doc. 63 at 3-4.  Scott claims he was attacked by another inmate.  Doc. 55 at 39.

nutritional supplement drink.  Doc. 65 at 15.  The physician also recommended that Scott receive Boost nutritional supplements four times a day.  Doc. 65 at 16.

Although not alleged in his complaint, Scott claims he was forced to eat Jell-O after his jaw was wired shut, which violated his religious practices because he believes Jell-O contains pork.  Doc. 54 at 14, 52.  Scott also claims nursing staff failed to provide him an alternative to Jell-O and forgot his nutritional supplement at most meals.  Doc. 54 at 15, 52–53.  The record does not reflect Scott ever informed Health Services that he was starving or malnourished or that his religious practices prohibited him from consuming Jell-O.  Doc. 59 at 4; Doc. 60 at 4–5; Doc. 65 at 15–18.  Scott also did not file any grievances with the prison concerning his allegations that he was forced to consume Jell-O in contravention of his religious beliefs and that he was not provided his nutritional supplements.  Doc. 59 at 4.

On November 3, 2019, Scott complained to nursing staff that he could not swallow Jell-O.  Doc. 60 at 5; Doc. 65 at 17.  Scott also requested applesauce and Boost supplements, stating that he was only provided three Boost supplements that day when he was supposed to receive four.  Doc. 58 at 22–23; Doc. 60 at 5.  After nursing staff informed him that the kitchen would provide his meals and supplements, Scott became angry.  Doc. 58 at 22–24; Doc. 60 at 5–6.  He threw his Styrofoam medicine cup at a nurse, called her a bitch, and flipped her off.  Doc. 58 at 23–24; Doc. 60 at 4; Doc. 61 at 4–5.  Scott was placed in disciplinary segregation for ten days due to the incident.  Doc. 58 at 25.

Scott concedes that he threw his Styrofoam cup at the nurse.  Doc 55 at 40.  He also submitted an affidavit from another inmate, Trev Jacobs, who stated that Scott became agitated on the day of the incident when nursing staff did not have Scott's nutritional supplements.  Doc.

46. Jacobs states a nurse made a comment like "Do I need to remind you why you got your jaw broken in the first place," which upset Scott so much he threw his medicine cup at her.  Doc. 46.

Due to Scott's altercation with another inmate in October 2019, his security ranking was changed, and he was no longer allowed to be housed at MDSP.  Doc. 38; Doc. 64 at 2.  Scott was transferred to SDSP on November 5, 2019.  Doc. 39 at 48; Doc. 59 at 4.  Because Scott's jaw was wired shut and he was a choking risk, he was placed in the infirmary so nurses could respond to any medical issues quickly.  Doc. 37 at 41; Doc. 39 at 49.  Nursing staff attended Scott on a daily basis there from November 7, 2019 to November 14, 2019.  Doc. 37 at 42; Doc. 39 at 50; Doc. 65 at 17.  Scott did not report any urinary issues during this time.  Doc. 37 at 42; Doc. 39 at 50.

On November 20, 2019, Scott refused a cystoscopy at his appointment with Dr. Witte. Doc. 37 at 42; Doc. 39 at 50.  Scott stated he wanted Dr. Fournier to perform the cystoscopy at his Yankton clinic because the procedure was initially his recommendation.  Doc. 37 at 42; Doc. 39 at 50.  Scott now claims he did not refuse the cystoscopy and was merely reluctant to receive treatment from Dr. Witte.  Doc. 55 at 41.  Per Scott's request, Dr. Witte referred him to Dr. Fournier for treatment.  Doc. 37 at 42; Doc. 39 at 50.

On December 2, 2019, Scott submitted a kite slip reporting that he had been urinating blood clots for about a week.  Doc. 37 at 43; Doc. 39 at 51.  On December 12, 2019, Scott visited Health Services and requested to see Dr. Fournier.  Doc. 39 at 52.  Nursing staff reminded him that he was not eligible to receive treatment in Yankton due to his security status.  Doc. 37 at 44; Doc. 39 at 53.  Scott responded he was agreeable to undergo surgery in Sioux Falls, although he still preferred to have surgery with Dr. Fournier in Yankton.  Doc. 37 at 44.  Nursing staff

scheduled Scott for a consultation with Urology Specialists in Sioux Falls for January 24, 2020.

Doc. 37 at 45; Doc. 39 at 53.

### E. 2020 and 2021

On January 24, 2020, Scott saw Dr. Witte to discuss his treatment plan. Doc. 37 at 47;

Doc. 39 at 56. Scott reported that he could void, but sometimes he felt unable to fully empty his

bladder. Doc. 37 at 47; Doc. 39 at 56. Scott also requested that Dr. Fournier perform his

surgery. Doc 37 at 47; Doc. 39 at 56. Dr. Witte noted that he was unfamiliar with Dr. Fournier's

treatment plan, including whether Dr. Fournier had recommended serial dilations or a

urethroplasty, and informed Scott that he would follow up with Dr. Fournier. Doc. 37 at 47;

Doc. 39 at 56.[8]

On February 19, 2020, Scott visited Health Services and reported that his urine was

forking, it was difficult to void, and he had been told he needed to have surgery on his urethra.[9]

Doc. 37 at 48. Scott considers a forked stream to be a sign of urethral blockage. Doc. 55 at 46.

Dr. Witte called Health Services on February 21, 2020 and advised that Scott should go to

Yankton for treatment. Doc. 37 at 48; Doc. 39 at 57.

---

[8] In January 2020, Scott also reported suffering from a toenail infection and ankle problems.
Doc. 37 at 45; Doc. 39 at 54. Nursing staff took a culture of the toenail and prescribed cream for
the affected area. Doc. 37 at 45; Doc. 39 at 54. Although Scott had a normal gait and did not
appear to be in distress, nursing staff also referred Scott to an outside provider for his ankle pain.
Doc. 37 at 45; Doc. 39 at 54. Scott told the provider that he had persistent ankle swelling for
twenty years. Doc. 37 at 45; Doc. 39 at 54. The provider observed that Scott's ankle had a
normal range of motion and was not swollen, but an x-ray showed Scott had moderate to severe
osteoarthritis in the ankle. Doc. 37 at 45-46; Doc. 39 at 54. Scott was given medication and
referred to physical therapy for his ankle and knee pain. Doc. 37 at 46; Doc. 39 at 55. The same
month, Scott complained of folliculitis or "razor bumps" around his neck and was prescribed
bump cream. Doc. 37 at 46; Doc. 39 at 55.
[9] Scott also submitted a kite slip complaining of rashes on his face and private parts. Doc. 37 at
47; Doc. 39 at 56. Nursing staff examined Scott and noted he had closed sores on his skin. Doc.
37 at 48; Doc. 39 at 57.

On February 26, 2020, nursing staff spoke with Dr. Carpenter regarding Dr. Witte's recommendation for Scott's referral. Doc. 39 at 58. After conferring on Scott's security status, nursing staff reached out to the Urology Specialists clinic regarding Scott's treatment. Doc. 39 at 58. On March 6, 2020, Dr. Witte called Health Services and confirmed he was willing to continue to treat Scott. Doc. 37 at 49; Doc. 39 at 58. Afterwards, nursing staff scheduled a cystoscopy for Scott at the Urology Specialists clinic in Sioux Falls. Doc. 39 at 59.[10] Scott's appointment was postponed due to COVID-19. Doc. 37 at 49–50; Doc. 39 at 60.[11]

On June 1, 2020, Scott submitted a kite slip stating he had trouble urinating and his complaints to nursing staff were "fall[ing] on death [sic] ears." Doc. 37 at 51; Doc. 39 at 60–61. On June 3, 2020, Scott submitted a kite slip stating the nursing staff had scarred his urethra when they attempted to dilate him over the past year. Doc. 37 at 51; Doc. 39 at 61. In that kite slip, Scott also claimed Dr. Fournier had planned a two-part surgery, but he only performed the first part by removing Scott's catheter in 2018. Doc. 37 at 51. Scott also claimed he had blood in his sheets from urinating. Doc. 37 at 51.

Scott visited Health Services on June 5, 2020, and reported that he had noticed blood clots in his urine and there had been blood clots in his urine for the last seven years. Doc. 37 at

_____

[10] On March 19, 2020, Scott submitted a kite slip reporting that he had burning and itchy feet. Doc. 37 at 49; Doc. 39 at 59. Nursing staff saw Scott that day. Doc. 37 at 49. They noted his feet were not dry or cracked, and there were no skin rashes or open scores on his feet. Doc. 37 at 50; Doc. 39 at 59.

[11] Scott visited Health Services on May 20, 2020, and reported he had sores on his back. Doc. 37 at 50; Doc. 39 at 60. Nursing staff took a culture of his skin. Doc. 37 at 50; Doc. 39 at 60. Scott visited Health Services again on May 22, 2020, reporting toe pain and drainage. Doc. 37 at 50; Doc. 39 at 60. Nursing staff did not observe any drainage or signs of infection. Doc. 37 at 50; Doc. 39 at 60. They advised Scott to return to Health Services if he had any new symptoms. Doc. 37 at 50; Doc. 39 at 60. Scott claims that his skin color made it difficult for nursing staff to identify discoloration. Doc. 55 at 48.

52.  Nursing staff took a urine dipstick, which produced "abnormal" results.  Doc. 37 at 52; Doc. 39 at 62.  They sent the urine sample for testing and prescribed Scott an antibiotic.  Doc. 37 at 52; Doc. 39 at 62.  On June 16, 2020, Scott submitted a kite slip stating that the antibiotic prescribed did not "solve" his urinary issues.  Doc. 37 at 52; Doc. 39 at 62.  Scott also complained of serious pain during urination and difficulty voiding.  Doc. 37 at 52; Doc. 39 at 62.  Nursing staff informed him he had an upcoming appointment with a urology specialist.  Doc. 37 at 52; Doc. 39 at 62.

On June 26, 2020, Dr. Thum, another urologist at the Urology Specialists clinic, performed a cystoscopy.  Doc. 37 at 52; Doc. 39 at 62.  Dr. Thum noted the cystoscope passed through a "normal appearing urethra into the prostate" without difficulty, Scott was able to void, and he "tolerated the procedure well."  Doc. 37 at 52–53; Doc. 39 at 62–63.  There were two narrow bands of scar tissue in Scott's urethra, but the cystoscope traversed them easily.  Doc. 37 at 53; Doc. 39 at 63.  Dr. Thum also noted Scott's bladder appeared normal.  Doc. 37 at 53; Doc. 39 at 63.

After the procedure, Dr. Thum gave Scott a Foley catheter and recommended a follow up appointment for his "mild recurrent stricture."  Doc. 37 at 53; Doc. 39 at 63.  Scott refused the recommendation and stated he wanted to see Dr. Fournier for treatment.  Doc. 37 at 53; Doc. 39 at 63.  After returning to SDSP after surgery that day, Scott submitted a kite slip stating he "definitely had a problem with [his] stricture."  Doc. 39 at 64.  Scott also claims that he was urinating blood around this time and had a UTI.  Doc. 55 at 50.  Dr. Thum made a referral recommendation based on Scott's request to see Dr. Fournier.  Doc. 37 at 53.  However, Scott was not referred to Dr. Fournier because his security status made him ineligible to receive treatment in Yankton.  Doc. 37 at 54.

On June 30, 2020, Scott visited Health Services and complained of painful urination. Doc. 37 at 54; Doc. 39 at 65.  Nursing staff took a urine sample for testing.  Doc. 37 at 54; Doc. 39 at 65.  Scott submitted another kite slip on August 4, 2020, stating that he had trouble urinating.  Doc. 37 at 55; Doc. 39 at 65.  When Scott visited Health Services that day, he complained that he was only prescribed antibiotics for ten days at a prior appointment and that his symptoms would likely reoccur as soon as he was off the antibiotics.  Doc. 37 at 55; Doc. 39 at 66.  The nursing staff educated Scott about his urologist's plan and created a routine urology referral for his "ongoing urinary issue[s]."  Doc. 37 at 55; Doc. 39 at 66.

Another medical provider, Dr. Shamim, saw Scott the next day.  Doc. 36–275; Doc. 37 at 56.  Scott told Dr. Shamim that he could urinate and did not have significant blood in urine, although he complained of occasional flow disturbances.  Doc. 37 at 56; Doc. 39 at 67.  Dr. Shamim instructed Scott to come to Health Services for a bladder scan and self-catheterization if he experienced significant urinary retention.  Doc. 37 at 56.

Scott visited Health Services on October 1, 2020, and reported a burning sensation during urination.  Doc. 37 at 57; Doc. 39 at 67.  Nursing staff checked Scott for a UTI and informed him that he had an upcoming appointment with a urologist.  Doc. 37 at 57; Doc. 39 at 68.  Scott submitted another kite slip on October 16, 2020, complaining that it was painful and difficult to urinate.  Doc. 37 at 57; Doc. 39 at 68.  Nursing staff saw Scott that day, and Scott reported that his urination issues had worsened over the last several months.  Doc. 37 at 57; Doc. 39 at 68.  Per Dr. Shamim's treatment plan, nursing staff conducted a bladder scan which revealed 62 ml of fluid in Scott's bladder.  Doc. 37 at 57; Doc. 39 at 68.  Scott told nursing staff he had just urinated.  Doc. 37 at 57; Doc. 39 at 68.  Nursing staff educated Scott on how to self-catheterize when he had difficulty urinating.  Doc. 37 at 57; Doc. 39 at 68.  Nursing staff also asked Scott to

report to Health Services before performing a self-catheterization so that they could record the amount of urine collected. Doc. 37 at 57–58; Doc. 39 at 68.

Scott visited Health Services on November 11, 2020, and expressed concern about whether he should be performing self-catheterization. Doc. 37 at 58; Doc. 39 at 69. Nursing staff educated Scott on self-catherization, and Scott said that he understood. Doc. 37 at 58; Doc. 39 at 69. Scott self-catheterized himself that day, which produced 125 ccs of urine. Doc. 37 at 58; Doc. 39 at 69.

On December 7, 2020, Scott submitted a kite slip requesting medical records related to his urological issues. Doc. 37 at 58; Doc. 39 at 69–70. He also visited Health Services that day for a bladder scan and self-catheterization. Doc. 37 at 59; Doc. 39 at 70. The next day, Scott signed a Release of Responsibility refusing "treatment for PRN catheterization." Doc. 37 at 59; Doc. 39 at 70. Scott reported that Dr. Fournier had told him not to use a catheter because it might make it more difficult to repair Scott's urethral stricture. Doc. 39 at 70. Nursing staff informed Scott that he did not have to come to Health Services for self-catheterization if he wished. Doc. 37 at 59.

Scott submitted another kite slip on December 15, 2020, in which he repeated that Dr. Fournier had instructed him not to self-catheterize. Doc. 37 at 60; Doc. 39 at 71. Scott had another appointment with Health Services on Dec. 23, 2020, to receive new knee and ankle braces, during which he reported that it was painful and difficult to void at times. Doc. 37 at 63. Nursing staff instructed Scott to notify Health Services if his condition worsened and scheduled a urology appointment for him. Doc. 37 at 63–64.

On February 1, 2021, Scott had an appointment with Dr. Witte to discuss management options for his recurrent urethral stricture. Doc. 65 at 5. Due to Scott's complaints of recurring

24

symptoms, he was scheduled for a cystoscopy with retrograde urethrogram and a possible urethral dilation for March 25, 2021. Doc. 65 at 5. On February 2, 2021, Scott submitted kite slips stating that he would not let Dr. Witte perform major surgery on him. Doc. 65 at 6. Two days later, Scott submitted a kite slip stating he would allow Dr. Witte to perform the cystoscopy. Doc. 65 at 6.

On May 19, 2021, Dr. Witte performed a retrograde urethrogram and ureteroscopy, which revealed Scott had a 3 cm bulbar urethral stricture. Doc. 65 at 9. Dr. Witte concluded the stricture would likely be amenable to urethroplasty. Doc. 65 at 9. He explained to Scott that a urethroplasty was a different management option than a self-dilation treatment plan. Doc. 65 at 7, 9. After being explained the risk of both treatment options, Scott picked the urethroplasty, and the surgery was scheduled with Dr. Witte. Doc. 65 at 9. Scott now alleges that Dr. Witte's treatment plan would amount to functional castration. Doc. 54 at 18, 43; Doc. 55 at 59. A urethroplasty is not the functional equivalent of castration, rarely has any negative effect on sexual function, and has a low rate of other serious side effects. Doc. 65 at 10.

Dr. Carpenter submitted an affidavit providing her opinion that Scott's condition had improved to a point where Scott no longer needed to be transferred to a larger surgical center for a urethroplasty. Doc. 65 at 11. On May 25, 2021, while the Defendants' motion for summary judgment was pending, Health Services submitted an authorization request to allow Scott to undergo the urethroplasty. Doc. 65 at 3; Doc. 66–1. There is no evidence in the record that Scott will suffer handicap or any serious medical consequence from delaying the urethroplasty. Doc. 65 at 11.

### III. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B); <u>see also</u> <u>Gacek v. Owens & Minor Distribution, Inc.</u>, 666 F.3d 1142, 1145−46 (8th Cir. 2012). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in his pleading but "must set forth specific facts showing that there is a genuine issue for trial." <u>Gacek</u>, 666 F.3d at 1145. <u>See also</u> <u>Mosley v. City of Northwoods</u>, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587−88 (1986) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)).

## IV.  Discussion

### A. § 1983 Claims

"The Eighth Amendment requires state prison officials to provide inmates with needed medical care." <u>Jackson v. Riebold</u>, 815 F.3d 1114, 1119 (8th Cir. 2016). Section 1983 provides a cause of action against any "person who," acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. A

§ 1983 claim also allows a plaintiff to sue state employees in their individual capacities and in their official capacities.  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Scott's § 1983 claim alleges his Eighth Amendment right against cruel and unusual punishment was violated by the Defendants' "deliberate indifference to serious medical needs." Laganiere v. Cnty. of Olmsted, 772 F.3d 1114, 1116 (8th Cir. 2014).

Before bringing a § 1983 claim challenging prison conditions, the Prison Litigation Reform Act (PLRA) requires a plaintiff to exhaust all "available" administrative remedies.  42 U.S.C. § 1997e(a).  A prisoner exhausts available administrative remedies when he "complete[s] the administrative review process in accordance with the applicable procedural rules." Jones v. Bock, 549 U.S. 199, 218 (2007) (citation omitted).  District courts must decide whether a prisoner exhausted his administrative remedies before addressing the merits of his claims. Benjamin v. Ward Cnty., 632 F. App'x 301, 301 (8th Cir. 2016) (per curiam).  Defendants do not argue Scott failed to exhaust administrative remedies related to his urological complaints, and Scott has submitted kite slips concerning his urological care frequently in the years preceding this action.  Doc. 27.  Therefore, this Court concludes Scott has exhausted administrative remedies concerning his § 1983 claims related to his urological care.

To succeed on his deliberate indifference claim, Scott must show that (1) he suffered "an objectively serious medical need" and (2) that the "defendant[s] actually knew of, but deliberately disregarded, such need." McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009).  "An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).  "[A]ctual knowledge of a serious medical need may

be inferred from circumstantial evidence or from the very fact that the risk was obvious." Id. at

481–82 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).  It is sufficient to show that the

"defendant-official being sued had been exposed to information concerning the risk and thus must

have known about it." Letterman v. Does, 789 F.3d 856, 862 (8th Cir. 2015) (cleaned up) (quoting

Farmer, 511 U.S. at 842).  If such knowledge is shown, the plaintiff must also show the defendants

"'knew that their conduct was inappropriate in light of' the risk to the prisoner." Id. (quoting Krout

v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)).

     The plaintiff's burden to show deliberate indifference is greater than the burden to show

negligence. McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012).  The plaintiff must show

that the defendant's mental state was "akin to criminal recklessness." Id. (quotation omitted).

When evaluating whether a defendant displayed deliberate indifference to a plaintiff's serious

medical needs, a court considers the defendant's "actions in light of the information [the

defendant] possessed at the time, the practical limitations of [the defendant's] position[,] and

alternative courses of action that would have been apparent to an official in that position."

Letterman, 789 F.3d at 862 (citation omitted).  Examples of "[d]eliberate indifference may

include intentionally denying or delaying access to medical care, or intentionally interfering with

treatment or medication that has been prescribed." Pietrafeso v. Lawrence Cnty., 452 F.3d 978,

983 (8th Cir. 2006) (citation omitted).  "[M]ere disagreement with treatment decisions does not

rise to the level of a constitutional violation." Langford v. Norris, 614 F.3d 445, 460 (8th Cir.

2010) (citation omitted).

     Scott's complaints name the Defendants in their official and individual capacities.  Doc.

1.  Official and individual capacity suits differ in their pleading requirements and the defenses

available to defendants. See Hafer v. Melo, 502 U.S. 21, 25 (1991).  Thus, this Court addresses

Scott's claims against the Defendants in their official capacities and their individual capacities separately.

### 1. Official Capacity Claims

Scott's claim against the Defendants in their official capacities fails for two reasons. The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for money damages. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Therefore, § 1983 does not allow Scott to sue the Defendants in their official capacities for money damages. See id.; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983.").

Second, the Defendants raise Eleventh Amendment immunity as a defense. Doc. 27 at 25–26; Doc. 36 at 4. It is well-established that, absent consent by the State or congressional abrogation of sovereign immunity, the Eleventh Amendment generally bars federal court lawsuits seeking monetary damages from States or individual state officers in their official capacities. E.g., Will, 491 U.S. at 66; Edelman v. Jordan, 415 U.S. 651, 662–63 (1974); Trevelen v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996). Section 1983 did not abrogate South Dakota's Eleventh Amendment immunity, Quern v. Jordan, 440 U.S. 332, 345 (1979), and South Dakota has not consented to official capacity suits for money damages under § 1983, Hart v. Miller, 609 N.W.2d 138, 147 (S.D. 2000). Therefore, the Defendants are entitled to judgment as a matter of law on Scott's claims seeking money damages against them in their official capacities.

### 2. Individual Capacity Claims

Scott claims Nurses LeAnn Peterson, Kelley Swanson, and Rachael Tycz were deliberately indifferent to his medical needs based on the care they provided to him. He argues that Dr. Mary Carpenter and Dr. Eugene Regier oversaw the actions of nursing staff and therefore are vicariously responsible for the actions of Nurses Peterson, Swanson, and Tycz. Doc. 54 at 17, 37. He argues Physician Assistant Ryan Manson and Nursing Supervisor Jessica Schreurs are also liable because, as "on-site" supervisors, they are responsible for the attitude of nursing staff and the culture of Health Services. Doc. 54 at 38.

The Defendants raise qualified immunity as a defense to Scott's claims against them in their individual capacities. Doc. 36 at 4–7; Doc. 58 at 26. "On summary judgment, a defendant official is entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Walton v. Dawson, 752 F.3d 1109, 1116 (8th Cir. 2014). Plaintiffs must establish both prongs to defeat qualified immunity. Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015). Courts may examine the prongs of a qualified immunity analysis in any order based on the circumstances of each case. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

A prisoner's Eighth Amendment right of protection against "deliberate indifference to serious medical needs" is clearly established. Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000); Laganiere, 772 F.3d at 1116. But to overcome qualified immunity, Scott also must demonstrate he suffered a deprivation of his Eighth Amendment right in that he had "an objectively serious medical need" and the Defendants "'actually knew of, but deliberately disregarded, such need.'" Laganiere, 772 F.3d at 1116); see also Farmer, 511 U.S. at 837. This Court reviews Scott's claims by year. The record when viewed in the light most favorable to Scott makes clear that he does not

30

have a viable Eighth Amendment claim.  Thus, the Defendants are entitled to summary judgment, whether under a qualified immunity or merits of the claims analysis.

### a.  2013 to 2016

Scott concedes that, having filed his complaint on September 17, 2020, the statute of limitations generally bars his claims for actions predating September 17, 2017.  Doc. 54 at 3; Doc. 55 at 2.  Yet he argues the statute of limitations should not bar his claims against Nurse Peterson for events in 2013.  Doc. 54 at 19.  Scott alleges that in 2013 he reported pain and blood in his urine to Health Services, but Nurse Peterson refused to send him to the hospital.  Doc. 1; Doc. 9; Doc. 39 at 3.  Scott believes that the statute of limitations should not apply to this claim because, at the time of the alleged violation, he did "not know medicine of law," he "was severely limited in his ability to research or investigate the possibility of" an Eighth Amendment claim, the prison library was "fragmentary and outdated," and he had no attorneys to assist him. Doc. 54 at 21.  The Defendants respond that Scott's claims concerning activity in 2013 and 2014 are barred because South Dakota imposes a three-year statute of limitations for § 1983 claims. Doc. 27 at 26; Doc. 36 at 12-16.

Section 1983 does not contain a specific statute of limitations, so federal courts "apply the most analogous state statute of limitations." Bell v. Fowler, 99 F.3d 262, 265–66 (8th Cir. 1996).  The most analogous South Dakota statute of limitations is SDCL § 15-2-15.2, which states: "[a]ny action brought under the federal civil rights statutes may be commenced only within three years after the alleged constitutional deprivation has occurred."

"Although courts look to state law for the length of the limitations period, the time at which a § 1983 claim accrues 'is a question of federal law . . . .'" McDonough v. Smith, 139 S. Ct. 2149, 2155 (2019) (quoting Wallace v. Kato, 549 U.S. 384, 388 (2007)).  Under federal law,

"the standard rule [is] that accrual occurs when the plaintiff has a complete and present cause of action . . . . [T]hat is, when the plaintiff can file suit and obtain relief . . . ." Wallace, 549 U.S. at 388 (cleaned up). For instance, a "plaintiff's cause of action accrues when he discovers, or with due diligence should have discovered, the injury that is the basis of the litigation." Johnson v. Precythe, 901 F.3d 973, 980 (8th Cir. 2018), vacated on other grounds, 139 S. Ct. 1546 (2019). Under Rule 3 of the Federal Rules of Civil Procedure, a lawsuit is commenced when the complaint is filed.

Scott's claim against Nurse Peterson accrued no later than April 2014, when Dr. Arend diagnosed Scott with urethral scarring and a mild recurrent stricture, if not sooner. Doc. 37 at 2; Doc. 39 at 4. Scott's diagnosis of a urethral stricture would have alerted him of a prior injury, which Scott now alleges occurred due to Nurse Peterson's failure to provide care. See Precythe, 901 F.3d at 980. Scott filed a complaint on September 17, 2020, Doc. 1, which was more than three years after he was diagnosed with a stricture in April 2014. Thus, the statute of limitations bars Scott's claim against Nurse Peterson.

### b. 2017

Next, Scott brings a claim for deliberate indifference against nurses Kelley Swanson and Rachael Tycz arising from his visit to Health Services on November 13 and 14, 2017. Doc. 55 at 3. Scott visited Health Services at around 11:15 p.m. on November 13, 2017, and reported suffering from bladder spasms. Doc. 37 at 4; Doc. 39 at 5. Nursing staff determined Scott could void, although he had trouble urinating, and took a sample of Scott's urine for analysis. Doc. 37 at 4; Doc. 39 at 64. The medical records noted that Scott appeared to be in pain but did not appear to be in great distress. Doc. 37 at 4; Doc. 39 at 6. Nursing staff documented the results of the urinalysis then sent Scott back to his housing unit. Doc. 37 at 4; Doc. 39 at 6.

Scott argues that the Defendants displayed deliberate indifference to his serious medical needs by refusing his request to be sent to the hospital immediately and instead instructing him to return to Health Services the next day. Doc. 54 at 35. The Defendants admit Scott had difficulty voiding when he visited Health Services on November 13, 2017. Doc. 27 at 6. However, they argue Scott's claim against nurses Swanson and Tycz must fail because they were not working during the days in question. Doc. 36 at 19, 30. The medical record shows that LPN Janelle Wilking treated Scott on the night of November 13, 2017, and when he returned to Health Services on the morning of November 14, 2017. Doc. 36 at 19. Additionally, the Defendants argue Scott's claim fails because the Eighth Amendment did not require nursing staff to send Scott to the hospital immediately. Doc. 36 at 22–23.

"To prevail on a claim that a delay in medical care constituted cruel and unusual punishment, an inmate must show both that: (a) the deprivation alleged was objectively serious; and (b) the prison official was deliberately indifferent to the inmate's health or safety." Riebold, 815 F.3d at 1119 (citation omitted). "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009) (cleaned up and citation omitted). "Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed." Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir. 2006).

Under a review of the facts in the light most favorable to Scott, he has failed to establish an objectively serious deprivation or deliberate indifference to his health and safety. Although

Scott was in pain when he first reported to Health Services, nursing staff responded to his complaint by taking a urine sample for analysis.  Nursing staff also noted that Scott was able to void.  Doc. 37 at 4; Doc. 39 at 6.  On this record, nursing staff did not disregard a known risk to Scott's health by performing a diagnostic test rather than immediately sending Scott to the hospital.  A urinalysis was not Scott's preferred method of treatment, but nursing staff's more conservative approach to Scott's care does not rise to an Eighth Amendment violation.  See Est. of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995) ("[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation.").

Further, when an "inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (cleaned up and citation omitted).  Scott alleges he suffered additional pain for several hours due to nursing staff's initial refusal to send him to the hospital.  Doc. 37 at 4; Doc. 39 at 6.  However, such a claim is not sufficient to show an Eighth Amendment violation. See Riebold, 815 F.3d at 1119–20 (explaining that an "inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.") (cleaned up and citation omitted).

Scott also claims Nurses Swanson and Tycz instructed him to drink water after he complained of difficulty voiding on the night of November 13, 2017.  Doc. 1; Doc. 54 at 24. However, the record shows that Swanson and Tycz were not working that night.  Doc. 36 at 19. Even if there was a factual basis to support this claim, Scott has not shown that nursing staff were deliberately indifferent to his medical needs.  Scott had a history of difficulty voiding in 2013 and 2014, but the medical records indicate that Scott was able to void on the night of

November 13, 2017. Doc. 37 at 4. Nursing staff may have believed Scott had trouble voiding because he was dehydrated and recommended drinking water to alleviate Scott's discomfort; a recommendation Scott was free to reject. "Deliberate indifference is equivalent to criminal-law recklessness, which is more blameworthy than negligence," and "must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." Schaub v. VonWald, 638 F.3d 905, 914–15 (8th Cir. 2011) (cleaned up and citation omitted). "The existence of a possible alternate course of treatment, which may or may not have been successful, is not sufficient to raise an inference of deliberate indifference where the prison officials acted reasonably but ultimately failed to avert the harm." Dulany v. Carnahan, 132 F.3d 1234, 1241 (8th Cir. 1997) (cleaned up) (citing Farmer, 511 U.S at 844). Even if drinking water was not the best course of treatment based on Scott's symptoms at the time, Scott has failed to show that nursing staff were deliberately indifferent.

Scott brings a second claim against the Defendants for deliberate indifference when he returned to Health Services at 1:18 a.m. on November 14, 2017, alleging that Nurses Swanson and Tycz "had the opportunity to treat him and refused to do so." Doc. 1; Doc. 55 at 4. Although Scott does not dispute that nursing staff flushed his catheter and sent him to the hospital that morning, he implies that the medical record is questionable here because ER staff was unable to irrigate Scott's catheter later that day. Doc. 39 at 6–8; Doc. 55 at 6. Scott also alleges that he was in the early stages of sepsis and had an E. coli infection when he was sent to the hospital that morning. Doc. 1; Doc. 54 at 36; Doc. 55 at 8–9. And he alleges that his bladder would have ruptured and he could have died, if he was not sent to the hospital on the morning of November 14. Doc. 54 at 25; Doc. 55 at 7; Doc. 65 at 12.

This claim fails because it lacks a factual basis.  The medical records show Scott's vital signs and white blood cell count were normal when he arrived at the hospital and there was no indication of sepsis or an E. coli infection.  Doc. 36 at 32; Doc. 37 at 6; Doc. 39 at 8.  Further, although nursing staff did not change Scott's catheter that morning, they provided care by flushing his catheter and sending him to the hospital.  Doc. 39 at 6–7; Doc. 55 at 6; see Meuir v. Greene Cty. Jail Emps., 487 F.3d 1115, 1119 (8th Cir. 2007) (holding that "an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment . . . [i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate" (citation omitted)).

Scott also claims nursing staff retaliated against him for seeking treatment when he returned to Health Services on the morning of November 14, 2017.  Doc. 1.  According to Scott, nursing staff tried to provoke him into saying something "inappropriate," putting him at risk of transfer to the Segregated Housing Unit.  Doc. 1.  "A prisoner's Eighth Amendment rights are violated if prison officials impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right.  A prima facie case of retaliatory discipline requires a showing that: (1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline.  The plaintiff-inmate has a heavy evidentiary burden to establish a prima facie case." Meuir, 487 F.3d at 1119 (cleaned up and citation omitted).  Scott has not alleged or shown that he was actually disciplined for visiting Health Services on November 14, 2017.  Doc. 1.  Thus, the Defendants are entitled to summary judgment on this claim.[12]

---

[12] In a Declaration submitted after the Defendants moved for summary judgment, Scott claims that Nurses Swanson and Tycz retaliated against him for requesting replacement catheter bags. Doc. 43.  Scott submitted a disciplinary report dated May 19, 2017, which stated Scott was

###### c.  2018 to 2021

From 2018 to 2021, Scott claims he suffered from blood in his urine, pain when voiding, difficulty voiding, and his complaints of these symptoms fell on deaf ears. Doc. 1; Doc. 55 at 52–53, 57–58. Further, he claims generally that he "suffered numerous infections and other complications related to having a suprapubic catheter for five years," and the Defendants did not provide him adequate medical and cleaning supplies to minimize the risk of infection. Doc. 55 at 16. The Defendants argue that they provided adequate care. Doc. 36 at 3.

The record does not support Scott's allegations that his complaints fell on deaf ears. Several urologists provided care for Scott consistently since 2017, and nursing staff responded to his kite slips and medical complaints regularly, sometimes daily, during the three years before the commencement of this action. Further, nursing staff gave Scott overnight drainage bags, leg bags, briefs, and regularly changed Scott's catheters. Doc. 37 at 9–10. Although Scott generally alleges that the Defendants refused to treat him, he does not dispute the records documenting his care. Instead, Scott claims nursing staff were often "reluctant" to treat him and frequently belittled, harassed, and embarrassed him when they provided treatment. Doc. 55 at 15, 18–19. These allegations are insufficient to show an Eighth Amendment violation. "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

---

disciplined for appearing at Health Services without a pass and being "very rude and belligerent" to medical staff. Doc. 43. However, according to Scott, Nurses Swanson and Tycz "concocted a story and had me thrown into segregation for conduct . . . for four days." Doc. 43. Any such claim is barred because it was not raised in Scott's complaint and falls outside of the statute of limitations. See Wendt, 971 F.3d at 820–21; Bell, 99 F.3d at 265–66.

"On more than one occasion," Scott also claims nursing staff discussed his medical issues in front of other prisoners in violation of HIPPA.  Doc. 54 at 46; Doc. 55 at 19.  However, "[s]ince HIPAA does not create a private right, it cannot be privately enforced either via § 1983 or through an implied right of action."  Adams v. Eureka Fire Prot. Dist., 352 F. App'x 137, 139 (8th Cir. 2009) (per curium).

Scott also argues that correctional staff failed to maintain security, which allowed him to be assaulted and violated his "right to be safe from cruel and unusual punishment" on August 9, 2018 and October 19, 2019.  Doc. 54 at 2–3.  See Farmer, 511 U.S. at 833 ("[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." (cleaned up and citations omitted)).  From Scott's perspective, he was disciplined for fighting back in self-defense, and the failure of correctional staff to protect him caused him to be transferred to SDSP, where he was not allowed to be treated by Dr. Fournier.  Doc. 55 at 26–27.

 Scott's claim concerning the assaults fails because he did not name any correctional officers as defendants and thereby failed to plead the claim in his complaint.  Doc. 1; Doc. 58 at 19.  See Wendt, 971 F.3d at 821 (holding a "district court properly refused to consider" a claim that was not pled in the complaint); East v. Dooley, No. 4:19-CV-04126-RAL, 2020 WL 5816248, at *27 (D.S.D. Sept. 30, 2020)  (refusing to consider a "claim for sexual abuse because [the plaintiff] did not plead it in his complaint"), aff'd, 847 F. App'x 359 (8th Cir. 2021) (per curiam).  Even if Scott had properly pleaded this claim, the record does not support Scott's allegations that correctional officers failed to protect him from unprovoked attacks.  Doc. 58 at 21; Doc. 62 at 3–5; Doc. 63 at 3–5.

In October 2019, after Scott's jaw was wired shut, he claims that nursing staff violated his First Amendment rights by providing him Jell-O to eat.  Doc. 54 at 18, 52.  Scott also claims

38

that the Defendants failed to provide his prescribed nutritional supplements during this time. Doc. 54 at 15.  There is nothing in the record to support Scott's claim that nursing staff "forced" him to eat Jell-O.  Doc. 58 at 28.  In fact, the only complaint Scott raised to nursing staff concerning Jell-O was that he could not swallow it.  Doc. 58–1; Doc. 60; Doc. 65 at 14–18. Scott also never submitted kite slips or grievance forms related to the Defendants' alleged attempt to force him to eat Jell-O or their failure to provide his nutritional supplements; nor has he raised this claim his complaint.   Doc. 58 at 29-31, 34.  Because Scott has failed to exhaust administrative remedies, this claim fails.  42 U.S.C. § 1997e(a); see also Benjamin, 632 F. App'x 301 (cleaned up) ("There is no question that exhaustion is mandatory under § 1997e(a) and that unexhausted claims cannot be brought in court.").

Next, in response to the Defendants' motion for summary judgment, Scott submitted a declaration stating he suffered retaliation "on numerous occasions," which has "hinder[ed] [his] right to due process."  Doc. 43.  See Meuir, 487 F.3d at 1119 (providing the elements of a prima facie case of retaliatory discipline).  Without providing further detail, he claims his medical records "vanish[ed]" and his property was stolen after he filed his complaint.  Doc. 43.  This claim fails because it was not raised in Scott's amended complaints.  See N. States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1057 (8th Cir. 2004) ("Thus, while we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment.").  Further, merely alleging an act is retaliatory without providing supporting facts does not create a viable claim for retaliatory discipline that survives a motion for summary judgment.  Meuir, 487 F.3d at 1119.

Finally, Scott argues that the Defendants have denied him the surgery that could treat his urological stricture disease. Doc. 55 at 46–47. "In Late March 2021," after the Defendants moved for summary judgment, Scott alleges Dr. Witte explained that the surgery he proposed involved taking a skin graft from Scott's mouth and using it to reconstruct his urethra. Doc. 54 at 43. Scott claims that, if the surgery went perfectly, Dr. Witte informed him that he would "be left permanently and irreparably impotent and infertile." Doc. 54 at 43. Thus, Scott argues Dr. Fournier's plan "seems to be the best . . . available" to treat his urological stricture disease. Doc. 55 at 35, 45. Additionally, Scott claims Dr. Fournier and Dr. Witte informed him that self-catheterization could damage his urethra. Doc. 55 at 35, 55.

The Defendants argue Scott's claim merely concerns his disagreement with the treatment recommended to him, and this claim fails because the Eighth Amendment does not guarantee a plaintiff the right to specific treatment. Doc. 36 at 44, 59. While Scott's preferred course of treatment is not self-catheterization and Dr. Witte is not his preferred provider, the Defendants argue that Dr. Witte's treatment recommendations are sufficient to address Scott's medical needs. Doc. 58 at 7. The Defendants also argue the record contradicts Scott's claim that self-catheterization could damage his urethra. Doc. 37 at 62–63; Doc. 58 at 7.

Except in cases where an inmate's Eighth Amendment right has been violated, the inmate has "no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Dulany, 132 F.3d at 1239; see also Hines v. Anderson, 547 F.3d 915, 920 (8th Cir. 2008). "Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996).

There is no factual basis for Scott's claim that Dr. Witte's treatment plan would make him impotent and infertile. Doc. 65 at 10. Nor is there anything in the medical record that supports Scott's allegation that performing self-catheterizations, as prescribed by his doctors, would damage his urethra. Doc. 37 at 62–63; Doc. 58 at 7. Scott's medical records are thorough and demonstrate that, over the last six years, Scott's urologists consistently recommended self-catheterization to manage his urethral stricture. Doc. 37 at 63; Doc. 58 at 7. Thus, there is nothing in the record to suggest any of the Defendants were deliberately indifferent to Scott's medical needs by implementing the treatment plan of Dr. Witte and other urologists for his care. See Meuir, 487 F.3d at 1118–19 ("A prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation.") (cleaned up and citation omitted). In fact, nursing staff attempted to accommodate Scott's wishes by referring him to Dr. Fournier. Doc. 37 at 39; Doc. 39 at 46–47.

### V. **Conclusion and Order**

Because Scott does not have a viable Eighth Amendment claim, the Defendants are entitled to summary judgment. It is hereby

ORDERED that Defendants' Motion for Summary Judgment, Doc. 35, is granted. It is further

ORDERED that Scott's requests to name Janelle Wilking as a defendant, order discovery, appoint medical experts, and appoint counsel, are denied. Doc. 54 at 60.

DATED this _17th_ day of September, 2021.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE

41